[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION FOR PARTIAL STAY
CT Page 4052
The plaintiff, Office of Consumer Counsel ("OCC"), moves for a partial stay pending determination of its appeal from a decision of the Department of Public Utility Control ("DPUC"), in Docket No. 99-0205, entitled Application of the Connecticut Light and Power Company for Calculation of Stranded Costs. The DPUC decision determined the base upon which CLP's stranded costs are to be calculated, the exact amount subject to future variables, the manner of recovery of those costs by CLP, and established the minimum bid in a forthcoming auction of CLP's nuclear assets. 0CC only seeks a stay as to the establishment of the minimum bid.
By way of background, in 1998 the Legislature enacted Public Act 98-28 entitled An Act Concerning Electric Restructuring, C.G.S. §§ 16-244-245y. The purpose of the Act, as stated in the findings of the Legislature, is to retain a regulated distribution of electric service within the state, while allowing the competition in the generation of electricity (§16-244(4)). In effect, the Act limited companies like CLP to the status of regulated distribution companies, controlling the wires over which electricity is delivered, while requiring divestiture of their energy generating assets to promote competition so that the restructuring results in lower rates to customers.
Section 16-244g(b) provides that not later than January 1, 2004, each electric distribution company shall either submit its nuclear generation assets to a public auction held in a commercially reasonable manner, or transfer its remaining nuclear generation assets to the legally separate affiliate at their book value, in which case no stranded costs shall be recovered. Section 16-244g(c)(3) provides:
The department shall determine the minimum bid price for each nuclear generation asset by determining the future net cash flow that a nuclear generation asset of comparable size, age and technical characteristics that is prudently and efficiently managed would be expected to produce over its expected remaining useful life, discounted to a present value." CT Page 4053
Section 16-244g(c)(2) provides that the DPUC shall not approve a sale unless the sales price equals or exceeds the minimum bid established by the department for the asset and the sale will result in a net benefit to rate payers, as determined by the department."
Section 16-245e(a)(6) defines "stranded costs" as meaning that portion of the following: (1) "generation assets," meaning the total construction and other capital asset costs of generation facilities approved for inclusion in rates before July 1, 1997, with certain exceptions; (2) "generation-related regulatory assets," meaning generation-related costs authorized or mandated before July 1, 1998 for inclusion in rates, including, but not being limited to costs incurred for deferred taxes, conservation programs, environmental protection programs, public policy costs and research and development costs, with certain exceptions; (3) "long term contract costs," meaning above-market portion of costs of contractual obligations approved for inclusion in rates that were entered into before January 1, 2000, arising from independent power producer contracts required by law or purchased power contracts approved by the Federal Energy Regulatory Commission. CLP are eligible to recover these stranded costs through rates charged their customers.
In the decision herein appealed from, the DPUC concluded that CL P's nuclear stranded costs came to $1,702,611,000 based on the evidence presented in the administrative proceeding. DPUC estimated the total potential sales value of CLP's investment in Millstone Nuclear Power Plant (MP2), Millstone Nuclear Power Plant 3 (MP3) and Seabrook Nuclear Power Plant was $139 million. In making that determination, DPUC noted the record would support market values ranging from negative $130 per kilowatt (k/w) to $35 k/w for Millstone 2, and $120 k/w to $387 k/w for Millstone 3. The Department also set the minimum bid in the public auction for MP2 at zero and for MP3 and Seabrook at $85/k/w based upon the expert testimony at the hearing. The decision stated, "In evaluating the bids the department will consider all benefits to taxpayers when comparing to the minimum bid."
0CC appealed DPUC's decision and four months later made this motion for partial stay. At the hearing of the appeal to this court, 0CC submitted the affidavit of Paul Chernick that challenges certain of the assumptions and bases for the DPUC decision establishing the aforesaid minimum bids. CLP objected CT Page 4054 to the affidavit on the grounds that 0CC has failed to meet the requirements of § 4-183(i) in that 0CC failed to show that there were irregularities in the procedure before the DPUC that are not shown in the record or that additional evidence was necessary to establish aggrievement. The court agrees with these objections, and strikes Mr. Chernick's affidavit.
The test for determining whether or not to grant a stay of an administrative agency decision is one of balancing the equities, taken into account (1) the likelihood that the plaintiff will prevail on the merits of the appeal, (2) the irreparable loss to the plaintiff unless the status quo is preserved, (3) the effect of the stay upon other parties to the proceeding, and (4) the public interest involved. Griffin Hospital v. Commission onHospitals and Health Care, 196 Conn. 451, 456-59 (1985).
0CC relies primarily upon the stricken Chernick affidavit as a basis for its contention that DPUC made errors in calculating the minimum bids for the three nuclear plants.
Section 16-244g(c)(3) states the DPUC shall determine the minimum bid price for each nuclear generation asset by determining the future net cash flow that a nuclear generation asset of comparable size, age and technical characteristics that is prudently and efficiently managed would be expected to produce over its expected remaining useful life, discounted to a present value. Clearly the statutory standard has many variables and allows considerable scope to the exercise of DPUC's discretion in reaching its decision on that issue. At the hearing, considerable evidence was adduced, including the testimony of experts and DPUC had the right to evaluate that evidence in reaching its decision.
The scope of review by this court under the Uniform Administrative Procedures Act is very restricted (Board ofEducation v. FOIC, 208 Conn. 442, 452 (1988)), in that this court may not adjudicate facts nor substitute its own discretion for that of the administrative agency, Greater Bridgeport TransitDistrict v. State Board of Education, 232 Conn. 57, 64 (1995). To sustain the agency's decision, it need only find that there is substantial evidence in the administrative record to support the agency's findings of basic facts and that the conclusions drawn from those facts are reasonable, Adriani v. CHRO, 220 Conn. 307,314-15 (1991).
Based on that standard and the limited portions of the record CT Page 4055 revealed in the briefs, this court concludes it is highly unlikely the plaintiff will prevail on the merits of its appeal relating to the DPUC's decision on minimum bids.
The central issue raised in this motion for partial stay is what effect the minimum bids will have upon the ultimate price realized at the auction for the plaintiffs nuclear generation assets. 0CC contends that a very low bid will result in a low auction price. This is a supposition which is not based upon evidence presented to the DPUC at its hearings. It is belied by the fact that all other states requiring the auctioning of nuclear generation plants make no requirement of a minimum bid at all before the auction.
CL P and the DPUC argue that a low minimum bid will encourage more bidders to participate in the auction and thereby result in a higher price. Testimony of experts at the hearing support this position. The DPUC adopted it and its decision is entitled to deference by this court.
At the center of this controversy is the interest of rate payers. The net proceeds of the auction of CLP's nuclear generation assets will be applied to reduce CLP's stranded costs that the rate payers ultimately will have to pay over the years. Thus, the higher the auction price realized, the lower the burden upon rate payers.
The evidence presented by DPUC at the hearing before this court is that there is a relatively small and uncertain market for the sale of nuclear generation assets. The market is good at the present. The delay in the auction occasioned by the granting of a stay may result in that market dissolving. This would have an adverse effect on the public interest. On the other hand, the public is really not hurt by the low minimum bids set by DPUC because DPUC is authorized by § 16-244g(c)(2) to approve the final auction price only if it "results in a net benefit to rate payers.
In balancing the equities, the court takes into account the low prospect of the 0CC prevailing on the merits of its appeal challenging the minimum bid determined by DPUC, the danger to rate payers of the limited market for nuclear power plants evaporating if the auction is delayed, and small risk to the same rate payers of a low minimum bid because the DPUC has the overall responsibility of to approve the auction price only if it CT Page 4056 benefits rate payers.
Weighing those considerations, the court concludes that a stay would be adverse to the public interest.
Accordingly, this court denies OCC's motion for a partial stay.
Robert Satter, Judge Trial Referee